Pages 1 - 32

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
   VS.                          )        NO. CR 20-71406 MAG
                                )
ADRIAN KYLE BENJAMIN,           )
                                )
            Defendant.          )
_____)

                          San Francisco, California
                          Thursday, October 14, 2020

         **TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS**

**APPEARANCES:**  (via Zoom)

For Plaintiff:
                          DAVID L. ANDERSON
                          United States Attorney
                          450 Golden Gate Avenue
                          San Francisco, California  94102
                  BY:  **MOHIT GOURISARIA**
                       **ASSISTANT UNITED STATES ATTORNEY**

For Defendant:
                          FEDERAL PUBLIC DEFENDER'S OFFICE
                          450 Golden Gate Avenue - 19th Avenue
                          San Francisco, California  94102
                  BY:  **DANIEL P. BLANK**
                       **ATTORNEY AT LAW**


Also Present:             **PEPPER FRIESEN, U.S. Pretrial Services**


Reported By:  Marla F. Knox, RPR, CRR, RMR
              United State Official Court Reporter

| | |
|---|---|
| 1 | **Thursday - October 14, 2020**                    **3:23 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | **THE CLERK:**  Calling Magistrate Action 20-71406, United |
| 5 | States of America versus Adrian Kyle Benjamin. |
| 6 | Counsel, please state your appearances for the record |
| 7 | beginning with the Government. |
| 8 | **MR. GOURISARIA:**  Good afternoon, Your Honor, Mohit |
| 9 | Gourisaria for the United States. |
| 10 | **THE COURT:**  All right.  Thank you, Mr. Gourisaria. |
| 11 | **MR. BLANK:**  Good afternoon, again, Your Honor, Daniel |
| 12 | Blank on behalf of Mr. Benjamin. |
| 13 | For the same reason as earlier, if it please the Court, I |
| 14 | will keep my video off just because my internet is unstable. |
| 15 | **THE COURT:**  That's fine. |
| 16 | **MR. BLANK:**  And as I indicated, Mr. Benjamin does |
| 17 | waive his appearance today; both in person and remotely. |
| 18 | **THE COURT:**  All right.  Thank you. |
| 19 | **MS. FRIESEN:**  Good afternoon, Your Honor, Pepper |
| 20 | Friesen with U.S. Pretrial Services. |
| 21 | **THE COURT:**  All right.  Thank you, Ms. Friesen. |
| 22 | And we will also note that there are folks in the audience |
| 23 | that would like to speak at the appropriate time, so we will |
| 24 | make sure we give them a chance to address the Court. |
| 25 | This is essentially an appeal from the magistrate judge's |

1  issuance of a pretrial release, order with conditions of

2  release.  And I have received filings now from both sides.

3       I guess, Mr. Blank, the concern obviously is the fact

4  that -- not only the seriousness of this offense, which is not

5  just not viewing pornography, but involves facts that involve

6  soliciting or asking minor victims to perform and to engage in

7  acts.

8       So it is not just your usual possession or receipt.  It is

9  almost a step away from production in some ways.  So you have a

10  very serious offense.

11       But most troubling to the Court is the fact that after the

12  FBI conducted the search and seizure, this behavior went on and

13  with, apparently, the assistance of Mr. Benjamin's mother.

14       I know that you argue that she had no idea what was going

15  on, but the Government's comeback is pretty clear that -- that

16  the family was well aware and were told by law enforcement what

17  the problem was.  So that makes for a very troubling situation.

18       But before we get to the family and the mother, I -- the

19  fact that Mr. Benjamin obviously knew that he had been under

20  surveillance or search conditions and that even though he was

21  the subject of a law enforcement search and seizure, he went on

22  to engage in conduct much the same kind of conduct as before

23  and after, which suggests an inability to control and danger to

24  community.  So I think you need to address that first.

25            **MR. BLANK:**  Yes, Your Honor.  Thank you.  And I agree

1  that this is more serious than some of the cases we have seen

2  before with just viewing downloaded images.  That's right.

3      And the Government has made a proffer -- of course, they

4  are at a greater advantage in terms of trying to figure out

5  what the facts are than I am -- that the same type of conduct

6  continued.

7      I'm not sure that that's exactly right.  But I understand

8  we can proceed by proffer.  If it comes down to that, we may

9  want to have witnesses that can talk about exactly what

10  happened before and what happened after.

11      The -- as to the -- as to Mr. Benjamin himself, he is

12  just -- not quite turning 25.  He has no prior law enforcement

13  contacts of any kind whatsoever.  None.

14      So I know that was a big part of why Pretrial Services

15  recommended that he be released and that Judge Cousins ordered

16  him released on those conditions.  They weren't even the

17  strongest conditions that we had offered.  We had offered to

18  have a second surety.

19      There are other ways that conditions could be even further

20  tightened up too; short of completely revoking the release

21  order.

22      It is concerning.  The allegations are extraordinarily

23  concerning.  But, of course, Mr. Benjamin is presumed to be

24  innocent.  And although the Government keeps relying on this,

25  the weight of the evidence is the least important -- least

1  important factor.

2      So -- and the question is whether the Government has

3  proved by clear and convincing evidence that no combination of

4  conditions can reasonably assure the safety of the community.

5      And if Mr. Benjamin is on lockdown with no access to the

6  Internet that is not monitored all the time by Pretrial

7  Services, I think, that there is a reasonable assurance as to

8  the safety of the community.

9          **THE COURT:**  How does one assure no access to the

10 Internet?  There are people in the house.  He has got a

11 brother.  He has got others in the house.  They have devices.

12 He could buy a device.

13     How can we -- how can there be this assurance

14 especially -- again, I understand the evidence of the offense

15 is the least weight of the factors -- but you have a specific,

16 it looks like, a transcript from April 22nd, which is after the

17 March 20th -- March 2020 interview in which he engages in

18 inappropriate conduct with what is called Discord 2, how do we

19 know with this inability to control that there won't be -- that

20 there is no access to the Internet?  How can you be sure of

21 that?

22         **MR. BLANK:**  Let me address that.  In two ways.  He

23 will have a custodian to be the eyes and ears of the Court at

24 all times.

25     We can ensure that any other electronic device in the

1    house is password protected.  And part of the custodian's job

2    would be to make sure that he does not know the password to

3    that.  And he doesn't have -- since he is no longer employed,

4    he doesn't have a source of income to go out and buy another

5    electronic device.  And the -- again, having a custodian and

6    sureties on the line can really be the eyes and ears of the

7    Court there all the time.

8         So I --

9         **THE COURT:**  Well, that assumes rigorous enforcement by

10   custodian.  And the proposed custodian here, there is an

11   indication here that there was not much vigilance.  That's

12   concerning.

13        **MR. BLANK:**  That is concerning.  That was not when

14   they were custodians.  That's not when they were sworn to --

15   under penalty of contempt to be vigilant and not when they are

16   on a bond that creates a lot of penalties if they are not

17   vigilant.

18        So I think that that's right.  And I think that they --

19   you know, if we just went back to the same thing where you

20   didn't have a custodian, that would not be sufficient.

21        But with a custodian, with a surety and -- you know, it

22   created a weird incentive, you know, the law enforcement seized

23   his electronics and then nothing followed.  There was no

24   arrest.  There was no immediate charge.

25        Mr. Benjamin understands now the extraordinary seriousness

1   as a legal matter, as well as other matters, of what he is

2   facing and that -- although it ought to have, it didn't exist

3   before when -- the first time the electronics were seized.

4       So we are in a different situation now.  And having

5   rebutted the presumption, I think that, you know, for someone

6   who has never been in trouble before, we can come up with

7   conditions to adequately assure the safety of the community.

8       **THE COURT:**  All right.  Let me hear from the

9   Government, a response.

10      **MR. GOURISARIA:**  Thank you, Your Honor.  Because

11  Your Honor has read our briefs, I plan briefly to rebut

12  Mr. Blank's arguments and correct the record on a few points --

13      **THE COURT:**  Yeah.

14      **MR. GOURISARIA:**  -- provide a new proffer of some new

15  information that has come to light and to emphasize briefly

16  only a handful of points, if I have Your Honor's permission.

17      **THE COURT:**  Yeah.

18      **MR. GOURISARIA:**  So, Your Honor, to begin with,

19  Mr. Blank talked about how devices would be password protected.

20      Now, even assuming that that were realistically able to be

21  done, Mr. Benjamin and both of the elders in the house when

22  asked what the password is for the wifi by law enforcement,

23  their answer was:  Oh, Mr. Benjamin knows that.  These are not

24  tech savvy people.  The tech savvy person here is Mr. Benjamin.

25      As to Mr. Blank's point about there was no arrest

1   following the search so a new device was provided.  Your Honor,

2   my understanding is that the new cell phone provided to him was

3   done one week after the search and seizure.

4       Your Honor, what Mr. Benjamin wants is that the benefit of

5   the doubt be given to him.  That's what Mr. Blank is asking

6   for.  The problem here -- and we will discuss this more -- is

7   that there is no doubt.  And even if it were in doubt, that

8   doubt should go to potential future victims of Mr. Benjamin,

9   not to Mr. Benjamin himself.

10      Let me give you the first example.  During the

11  October 1st -- I believe, was when law enforcement, the FBI,

12  arrested Mr. Benjamin and seized the additional devices that he

13  had acquired with the help of his mother and his mother's

14  boyfriend after March 2020.

15      A preliminary review of that phone was completed only last

16  night after I submitted my reply brief to Your Honor.  And that

17  preliminary review showed the existence of additional suspected

18  child pornography on the phone.

19      And equally troubling, it showed that Mr. Benjamin had

20  used applications such as Snapchat to communicate with

21  potential minor victims even though he specifically told law

22  enforcement that he hasn't used those applications in many,

23  many months.

24          **THE COURT:**  This is on the replacement phone?

25          **MR. BLANK:**  This is on the replacement phone,

1  Your Honor.  And this ultimately ties into much of the briefing

2  we have done.  And I would like to simply emphasize three of

3  the issues.

4      The first Your Honor brought up in opening this discussion

5  which is:  Mr. Benjamin continued his sexual exploitation of

6  minors after March 2020.  In other words, Your Honor, the

7  Government, the system, the public, already gave Mr. Benjamin a

8  chance to prove himself; and he has failed.

9      And this chance wasn't for a week or two weeks.  We are

10  talking about a six-and-a-half month gap.

11      The second point, Your Honor, is that the release

12  conditions are simply insufficient.  And, perhaps -- though not

13  binding precedent, perhaps the *U.S. versus Marigny* case is

14  instructive here.

15      I cited that in my brief, Your Honor.  But as a brief

16  background, that was a case where Defendant masqueraded as a

17  teenage girl to obtain sexually explicit content from minor

18  boys.  The magistrate judge in that case had set a $50,000

19  bond, and it had also said as one of the release conditions,

20  the Defendant can have no access to the Internet except for

21  mental health and medical treatment.

22      When that decision came before the District Court, even

23  though that Defendant, like Mr. Benjamin, had no criminal

24  history, that release order was revoked.  And it was revoked

25  because the Court held that neither wife nor the halfway house

1    can realistically monitor him.

2        And, Your Honor, that gets to the crux of the issue here,

3    which is that this case presents unique challenges.  This isn't

4    about a person who steps out and commits crimes.  He commits

5    crimes from the shadows, from the comfort of his own bedroom.

6        And Mr. Benjamin's case is far worse than Mr. Marigny's.

7    Why?  Because he shares a house with others who have multiple

8    devices.  His brother, with whom he shares a room and whose

9    devices we know he has gone on before; his mother who has

10   devices; his mother's boyfriend who has devices and minor

11   siblings, who presumably also have devices in the house.

12       Now all of the adults in the house except for Mr. Benjamin

13   has a full-time job.  Mr. Benjamin quit his job before the

14   pandemic to focus full time on making music.  They will be away

15   from the home, and Mr. Benjamin will be home alone.

16       Now, Mr. Marigny's wife, who was willing to act as

17   custodian, didn't have a chance to prove whether she could

18   succeed or fail as a custodian.  Why?  Because the District

19   Court said it is unwilling to put at risk potential future

20   minor victims.

21       Here, Your Honor, the system has already given --

22   Mr. Benjamin's mother has already given Mr. Benjamin's mother's

23   boyfriend (sic) a chance to monitor him; a chance to prove

24   themselves, and they have failed.  And they have failed not

25   without consequences.  They have failed at the expense of

1    additional minor victims who would not have existed but for

2    their providing the devices that they did.

3         Finally, Your Honor -- and we have the parent of one of

4    the victims, and I think she can make this point far, far

5    better than I can -- but the danger of sexual exploitation

6    online, perhaps, can sometimes feel distant but crimes like

7    these -- again, crimes committed in shadows from the comfort of

8    bedrooms, crimes committed against children who are at a

9    particularly vulnerable stage in their lives, in a particularly

10   vulnerable time with the pandemic, at a stage where they are

11   tethered to the computers even more so than they used to be

12   before, these have consequences.

13        And this isn't the Government's proffer.  These are

14   studies conducted by researchers, by the medical professionals

15   that say suicide, post-traumatic stress disorder, lifetime

16   difficulties with attachment, with intimacy, these are some of

17   the documented consequences.

18        In other words, this crime that Mr. Benjamin committed and

19   this crime that he has a high likelihood of continuing to

20   commit if left within the comfort of his home with the comfort

21   of access to devices, it is no less heinous, no less violent

22   than crimes committed in person.

23        To conclude, Your Honor, this is a case where a man

24   identified; groomed; enticed children to produce child

25   pornography.  And he has already proven to Your Honor that he

1    is committed to continue to do so, no matter if the FBI raid

2    his house, no matter what is right or wrong, no matter what the

3    conditions that will keep him as long as he has access to the

4    Internet; as long as he has access to electronic devices.

5         Again, Your Honor, the Defense would like you to give the

6    benefit of the doubt to Mr. Benjamin.  But there is no doubt

7    here.  And even if there were, the Government asks that you

8    give it to potential future victims.

9         **THE COURT:**  All right.  Thank you.  I would like to

10   hear from Pretrial and then from those who want to speak.  And

11   then I will give Mr. Blank a chance.

12        Ms. Friesen, do you have any second thoughts?  What are

13   your thoughts after hearing all of this?

14        **MS. FRIESEN:**  Your Honor, I did review the briefs

15   submitted by both the Government and the Defense.

16        At this time Pretrial will be standing by the

17   recommendation as proposed in the Pretrial Services report.

18        What I will say is that the -- any electronic devices that

19   are internet capable that the Defendant would be allowed to

20   possess would be monitored by our office.  We would be alerted

21   at any point if he is viewing anything that he is not allowed

22   to.

23        If the Court is inclined, we can limit this to even one

24   internet capable device if that is a concern the Court would

25   like to see mitigated further as well as limit the use of

1    internet capable devices for a search of employment or for

2    schooling in order to prevent any other kind of activity being

3    used.

4         So, yes, at this time we will be standing by the initial

5    recommendation.

6         **THE COURT:**  What about potential access to others'

7    devices or, you know, acquiring without notification a third

8    device or something, you know?  How can you -- is there a way

9    to safeguard against that?

10        **MS. FRIESEN:**  The safeguard that we would put in place

11   would be to have those devices password protected and not allow

12   the Defendant to have access to those passwords which would

13   need to be enforced by the custodian.

14        As I'm sure the Court is aware, when we supervise

15   Defendants who have a custodian, Pretrial stays in very

16   consistent contact with the custodian in order to receive as

17   many updates as we possibly can about the Defendant's behavior

18   to ensure compliance.

19        Additionally, with these kinds of cases and Defendants, we

20   do stay in very frequent contact with them in order to ensure

21   compliance.  So that would be the way we would mitigate that.

22        As far as obtaining future devices, unfortunately, there

23   really is no way.  And as far as his financial situation, it

24   doesn't see like there are financial means for him to obtain

25   that as far as the report goes.  That's the information that I

1  have.

2      And, of course, any custodians and anyone in the house

3  would not be allowed to provide those devices to him.

4      **THE COURT:**  What about the fact that the proposed

5  custodians here were the ones that more or less enabled him

6  after the FBI interview and seizure?  Does that cause you

7  concern?

8      **MS. FRIESEN:**  Yes, Your Honor.  I was informed by the

9  case agent during my interview with them that they did provide

10  devices after the fact.  I can't speak to whether or not they

11  knew what the conduct was.

12      I have heard -- based on both briefs submitted by

13  Counsel -- differing facts, and the weight of the evidence is

14  not something that we consider when making a recommendation

15  regarding release or detention.

16      I can't speak to whether or not they knew what the charges

17  were and what they knew when they provided him again with those

18  devices.

19      But, of course, that is a cause for concern.

20      **THE COURT:**  All right.  Thank you, Ms. Friesen.

21      Let's hear from Mr. Benjamin's supporters, his parents,

22  first.  Angie, if you can promote them.

23      **THE CLERK:**  I believe that is James.

24      **MR. BLANK:**  That's correct.  Thank you.

25      **THE CLERK:**  Please unmute.

1          **JAMES TAN:**  Can you hear us?

2          **THE COURT:**  Yes.  Welcome.

3          **JAMES TAN:**  So initially back in March, you know, we

4    were here when the raid happened.  We did -- they did provide a

5    warrant, but then we weren't exactly told what was -- what

6    happened.  They accused but then they did not specifically say

7    that, you know, it was regarding a minor or whatnot.

8          And that's -- and then, you know, after a few days, yes,

9    Lauren did purchase the phone for Kyle to contact but, again,

10   it wasn't for -- it was actually just a phone for us to contact

11   them at home.  No intention, you know, about, again, the

12   situation.

13         And if we knew, we would probably not going to buy any

14   device.  As soon as we spoke with Dan and, you know, we weren't

15   aware of that happening.

16         The computer that I purchased for him -- and, again, I did

17   purchase that -- that's because a few months later we did not

18   hear anything.  And the FBI, you know, told us that they would

19   return if they don't find anything.  But then we don't hear

20   anything back.

21         We keep calling.  And if there is anything -- there was no

22   update in the case.  And then -- you know, after a month,

23   I believe, I purchased that computer for him back in July or

24   August and that's when, you know, because -- Kyle is family.

25   So, of course, I felt for him.

1    And, again, we were all, like, asking what is going on.

2  We were not sure.  And then, you know, I offered him that if

3  you want, I can purchase this computer for you.  And when they

4  return it, maybe we can use that computer as a -- you know, as

5  a family computer and he agreed to that.

6    And that was basically the ultimate point I provided a

7  computer but not knowing of, you know, this was happening.  If

8  I knew, again, we are probably not going to consider purchasing

9  any devices for him.

10    **LAUREN GUEVARRO:**  They didn't let us know what the

11  search was for.

12    **THE COURT:**  So you were not aware or you thought it

13  was over after the FBI came?

14    **JAMES TAN:**  A little bit of both.  I mean, when they

15  came here, they said:  We are looking for something on Kyle --

16  or Adrian Kyle's device.  And that's what we were told.  And

17  they took everything and then they left.

18    And they said:  You know, if we don't find anything, we

19  will return the devices to you guys.  And, again, that was it.

20    After that, we called them.  I mean, there has got to be a

21  record that we called the office of FBI Department, and there

22  is no return or anything.  There is no update.

23    And throughout the months, you know -- again, yes, that

24  was the unknown.  Kyle makes music and he stays up in his

25  bedroom.  And he kind of felt, you know, like alone or whatnot.

1  So for me, buying him another computer for him to play games,

2  that was, like, the only thing I could do at that moment.

3      And that's why we purchased the computer.  Again, if I

4  knew, I wouldn't -- even now, as -- if this -- this -- knowing

5  right now, we are going to be as strict as it can get.  You

6  know, we are going to change the password; and he will not have

7  access to anything until this is finished.

8      **THE COURT:**  Did you know -- did he tell you that what

9  the FBI was investigating was child pornography?

10      **JAMES TAN:**  He did.  And he said he did not know that

11  he was talking to a minor or whatnot.  Again, it wasn't --

12      **LAUREN GUEVARRO:**  We don't know what was accused.

13      **JAMES TAN:**  It wasn't specifically told.  They didn't

14  talk to us about "oh, he can't use that computer."  We weren't

15  told about anything.  They just took the device.  Left the

16  warrant and left.  And we called --

17      **LAUREN GUEVARRO:**  They didn't let us know anything.

18      **JAMES TAN:**  No information whatsoever.

19      **THE COURT:**  All right.  Anything further you would

20  like to say?

21      **JAMES TAN:**  Yes.  I'm not a hundred percent sure what

22  is going on right now honestly.  This is our first time doing

23  all of this.  And even me talking right now, shaking.

24      But, you know, if Kyle can just go home, I will give you

25  my word.  We will pay attention.  I mean, we will focus and

```
 1   monitor him all day.

 2             LAUREN GUEVARRO:  At all times.

 3             JAMES TAN:  He will be fine.

 4             THE COURT:  All right.  And he is -- he shares a room

 5   with his brother?

 6             JAMES TAN:  Correct.  And his brother is aware as

 7   well.  And we talked to him already.  Even talking to him on

 8   the phone right now, we tell him, you know, just -- you know,

 9   it's our responsibility now as well to help Kyle.

10             THE COURT:  How old is his brother?

11             JAMES TAN:  I believe he is 23.

12             LAUREN GUEVARRO:  Twenty-two.

13             THE COURT:  He is working?

14             JAMES TAN:  Yes, he is working.

15             THE COURT:  Where does he work?

16             JAMES TAN:  He works part-time -- he is a teacher.  At

17   the same time part-time works at Subway.

18             THE COURT:  He is a teacher at a public school?

19             JAMES TAN:  I believe he teaches art at public school,

20   yeah -- college, I believe; right.

21             THE COURT:  All right.  Thank you.

22             THE CLERK:  Your Honor, may the parents state their

23   names for the record?

24             THE COURT:  Yes, please.

25             JAMES TAN:  May name is James Tan.
```

1      **LAUREN GUEVARRO:**  And Lauren Guevarro.

2      **THE COURT:**  All right.  Thank you.  All right.  I want

3   to give the victim or the victim's parents a chance to speak.

4   They have asked to be heard.  Go ahead and promote them, Angie.

5      **TINA P:**  Are you able to hear me?

6      **THE COURT:**  Yes.

7      **TINA P:**  As much as I can appreciate the parents

8   wanting their son to return home, my confidence -- is that

9   better?

10      **THE COURT:**  Yes.  Thank you.

11      **TINA P:**  As much as I can appreciate them wanting

12   their son home, my confidence in their custodian abilities,

13   especially in something like this, raised -- my red flags that

14   were raised was that, you know, they didn't mention right away

15   that he had told them what the charges were, the claims were

16   against him.

17      But then even after knowing that, they still didn't

18   restrict him.  That's a huge red flag for me.  I heard a

19   mention of younger siblings in the home in addition to the

20   23-year-old.  I'm not sure if there are other children in the

21   home.  But as an older -- having, you know, older siblings, it

22   is a punch in the arm and potentially a password.  So I'm not

23   completely convinced that that is the correct setting for him.

24   I think it is impossible in today's day and age to ensure no

25   access to the Internet.

1      As the attorney stated earlier, the internet relationships

2  do feel different.  There is a distance between them, but I

3  assure you with a minor girl, with a young teenage girl, they

4  feel very real.

5      My daughter, it felt very real.  He had convinced her that

6  they were in a relationship.  So I -- I can't -- I can't stress

7  enough that that age is so vulnerable.

8      That, again, additional victims are at risk if he is left

9  to be at home in his room by himself all day long.  It just

10  doesn't make sense to me.  That wouldn't even be possible --

11  and I'm not going to lie.  I was actually angered when I found

12  out that Pretrial Services were considering allowing him to

13  have devices.

14      Actual devices, regardless of how they are monitored, I

15  can't even fathom that we would have the technology to be able

16  to actually monitor something like that in a way that would be

17  truly meaningful.  That's just my opinion.

18      We have -- my husband and I have seven daughters that we

19  have tried to protect from these types of things.  The Internet

20  has just completely -- not completely.  The Internet has

21  removed a lot of those assurances, fake accounts, triple,

22  quadruple accounts.

23      Just a few weeks ago my daughter found a fake account or

24  another account that she believes belonged to Kyle.  This was

25  just a few weeks ago.  I don't know, maybe last month

1    potentially.  She doesn't have the dates.  She immediately

2    blocked him.  But she notified me.  She notified her counselor.

3         The threat to this community -- and I think I speak for

4    all parents of minor daughters -- is that, you know, as stated

5    prior, sex -- sex crimes against children, it lives with you

6    forever.  I know this from experience.  It is not something

7    that goes away.

8         My daughter has been in weekly counseling.  She has

9    recently found some tools so that she doesn't self harm

10   anymore.  And she is experiencing PTSD even just going out --

11   just really going out with friends, though, she is -- you know,

12   obviously COVID hasn't helped because they haven't been able to

13   see a lot of their friends.  And that, in my opinion, has made

14   it worse for her because she too now just feels more

15   comfortable only being at home causing more issues with

16   relationship building.

17        So I -- you know, when I was listening to the previous

18   case -- and I was so grateful that we appealed this -- because

19   I was angered that he was allowed to have any devices, period.

20   I heard several -- you know, I was on that entire call up until

21   ours was ended.

22        And for gun violence, of course, you are going to take

23   away the gun.  You are going to make sure that he doesn't have

24   any access to it.  You are going to revoke any previous

25   licenses, that sort of thing.

```
 1        If it were drug use, I heard rehab.  I heard full
 2   restriction of any kind of substance use.  And I was just
 3   absolutely appalled that in a child pornography case where he
 4   is creating it with his own devices that you would send him
 5   home to his safe place and give him his weapon.  It just blew
 6   my mind.  Absolutely blew my mind.
 7        I mean, if you are still considering it -- I hope you're
 8   not.  I really hope you are not -- I think a further
 9   restriction that he would not have any access to any device
10   between the hours of 8:00 p.m. and 8:00 a.m.  There is no
11   reason for him to have access during that time, period.
12        I don't know what time the crimes were committed.  I would
13   only assume that children would, you know, be home after
14   school.  Even if it was after school, I don't know.  Some sort
15   of additional restriction if you are even considering allowing
16   him to go home and have access to devices.
17        I made a lot of notes here.  But I think that's it.  I
18   appreciate your time, Your Honor.
19             THE COURT:  Thank you.  Thank you, Ms. Tina P.
20             MR. GOURISARIA:  Your Honor, if I may make a few brief
21   points.
22             THE COURT:  Yeah.
23             MR. GOURISARIA:  Your Honor, I sympathize with the
24   parents of Mr. Benjamin.  I really do.  But hearing them speak,
25   I wanted to emphasize why it actually proves the necessity of
```

1    the attention in this case.

2         It shows that Mr. Benjamin is manipulative.  It shows that

3    he knows how to cover his tracks.  Your Honor, we are talking

4    about somebody who created child pornography; produced it and

5    often participated in it.  We are talking about somebody who is

6    instructing children.  We are talking about somebody who is

7    masturbating when all this is happening.  It takes a lot to

8    hide that when you are sharing a house with multiple others and

9    sharing a house with your brother.

10        The second point, Your Honor, is I do not doubt the

11   competency of Pretrial Services.  They do excellent work with

12   very limited resources.  This isn't a typical case where

13   somebody is going on the Internet and downloading child

14   pornography.  I trust that the softwares can detect that.

15        I do not believe the softwares have the capability of

16   deciphering the chats that Your Honor has read; that I can

17   barely understand.

18        This is a much more manipulative, complex crime than

19   simply going on the Internet or going on the Dark Web and

20   downloading child pornography.

21        **MR. BLANK:**  Your Honor, can I briefly respond to what

22   we have heard so far?

23        **THE COURT:**  Yes.  I would like you to respond to a

24   couple of things.

25        Number one, as we stated at the outset, this is not

1   possession.  This is not a straight possession case.  There are

2   victims.  There are direct victims.  There are victims in every

3   case.  But often they are indirect victims.  Here, we have

4   direct victims.  And the risk to specific individuals is

5   extremely concerning.

6       Number two, what is being proposed just seems to me not

7   adequate.  To go back to the same setting -- I understand that

8   his parents have renewed a new pledge.

9       But I just don't see it.  I don't see how we can

10  prevent -- because he obviously has tremendous compulsion here

11  that is not controlled.

12      The fact that a month after the FBI interviewed him, he is

13  going right back to it -- whether you call it an addiction or

14  whatever you want to call it -- there is no self control.

15      And I don't see anything in here about treatment.  I mean,

16  I know there is a condition of treatment, but there is no

17  treatment plan.

18      So I don't see him going back to the house.  I'm telling

19  you that.  I mean, you can say what you want.  But if you are

20  going to come up with a plan other than jail, it is going to

21  have to be in a setting where it is not supervised by his

22  family, who I don't think -- as best as they can and as well

23  intended as they are -- can control him.  And I would want to

24  see, you know, some assessment about treatment and everything

25  else.  But the current plan is not going to work.

1        **MR. BLANK:**  Understood, Your Honor.  And let me also

2   say that I very much appreciate the comments by the parent.  It

3   takes a lot of courage to come to court and speak, and I

4   appreciate what she had to say.  You know, that's the tragedy

5   of these things is that there are parents on all sides.

6        I want to address the two things that, Your Honor, just

7   said.  But before I do and before I forget it, I did want to

8   respond to Government Counsel's statements.  It has now been a

9   few times about what happened during this period.  And the

10  passion with which Government Counsel talks about, the danger.

11       I don't understand why law enforcement took six months.

12  If Government Counsel really thought that this person was such

13  a danger, why the delay?  That's not been explained.  I don't

14  know what that is about.

15       Obviously Mr. Benjamin has to be held accountable for his

16  own conduct, but the Government seems to be wanting you to play

17  it both ways here saying that he is solely responsible and look

18  what happened with the six months.

19       But let me address, Your Honor's points.  It is not just

20  possession.  In a normal possession case I think we would have

21  some of the conditions that Your Honor has heard already.

22       Two devices with the -- that can be monitored, one parent,

23  an unsecured bond, I think we can have a stronger, you know,

24  tighter restrictions; adding another surety; having one or zero

25  internet capable devices.

1     If Mr. Benjamin is living with his parents as opposed to

2  living on his own or at a halfway house, he doesn't really have

3  a need to do online shopping or get groceries in that way.

4     Of course, in COVID-19, even more, everyone is having to

5  use the Internet to do this.  If he is at home, he doesn't have

6  to have any device at all.

7     **THE COURT:**  Let me stop you right there.  You

8  mentioned halfway house.  I want to ask that of Pretrial.

9  Wouldn't that be -- would that be a more assured setting if he

10  were in a halfway house supervised by professional people at a

11  halfway house that could monitor?  Whether he is subject to

12  search conditions, if the condition is no device or only one

13  device that could be monitored professionally and then that

14  device could be monitored, and there won't be the same

15  opportunity to sort of take advantage of lack of supervision,

16  do you have any thoughts about that, Ms. Friesen?

17     **MS. FRIESEN:**  Your Honor, certainly if the Defendant

18  was residing at a halfway house, the halfway house does inform

19  us of any issues that occur while he is there.

20     As far as internet capable devices, I'm not sure -- I know

21  that there may be communal areas where he could access the

22  Internet.  Again, that is communal and not something he would

23  have alone in his room.

24     The facility does do a headcount and room searches

25  periodically so if there were any devices found in his room,

that would be violation and then, again, that would be another

issue that we could determine at that time.

          THE COURT:  Wouldn't that better assure the safety of

the community?

          MS. FRIESEN:  Yes, I believe so.

          THE COURT:  Combine that with a specific program

because I think he needs treatment.  Combine a halfway house

with -- I don't know if it needs to be -- who is -- who is our

service provider or vendor anymore.  But if he were to get into

a program and be released for only treatment purposes, would

that make more sense and assure more safety yet provide him

with some path for rehabilitation?

          MS. FRIESEN:  Yes, Your Honor.  And there is a mental

health treatment condition added to the proposed recommendation

for this Defendant specifically due to the nature of the

charge.  And it currently -- it is as directed by Pretrial

Services because we don't have the capability to prepare a full

treatment plan for the Defendant.  But we would refer him out

for an assessment and allow the contracted vendor to make that

treatment plan.

     At this time all treatment is taking place via internet or

telephone due to the COVID-19 pandemic.  So it is possible

while -- if he is released to a halfway house, he could

participate in treatment via telephone at the halfway house or

via Zoom.  But he would not be released to go to a facility to

1  participate in treatment at this time.

2         THE COURT:  All right.  What does the Government think

3  of that route?

4         MR. GOURISARIA:  Your Honor, the Government thinks

5  that the halfway house is not sufficient here.  One, from my

6  previous experience with halfway houses, devices typically

7  don't always have wifi.  Maybe in common areas.

8     But any devices that are used in a room, for example, they

9  would be using cellular data.  So that would be --

10        THE COURT:  One of the restrictions would be no

11  device.  Only common area device.  If he wants to search for a

12  job or use something, he would use the communal device and that

13  would be monitored.

14        MR. GOURISARIA:  Yes, Your Honor.  And at the same

15  time it would be difficult to ensure -- to make sure this

16  doesn't happen unless we can truly ensure that the halfway

17  house conducts very regular, very in-depth searches of the

18  bedroom because these devices can be small.  They can be little

19  cellular phones.  They would be relatively easy for

20  Mr. Benjamin to hide.

21     And I think Your Honor explains why because this is an

22  addiction, Your Honor.  I think any environment in which he has

23  access or the potential for access to the devices doesn't leave

24  the community safe.

25        THE COURT:  All right.  Ms. Friesen, any comments

1    about that?

2          **MS. FRIESEN:**  Your Honor, we can advise the facility

3    that the Defendant is not allowed to have them; but we are

4    unable to control how often or how diligently they are

5    searching the Defendant's room.  That is outside what we are

6    able to do.

7          **THE COURT:**  Mr. Blank, any comment?

8          **MR. BLANK:**  Your Honor, I think we are coming up with

9    the possibility of a combination of conditions that will work.

10   And, of course, we will agree with any of these.

11       I don't know of the Government asserting a medical

12   diagnosis about an addiction.  I don't think that is what

13   Your Honor was saying.  I think what it shows is a serious

14   issue that needs to be addressed.  Whether it is a medical

15   compulsion that could not be addressed through treatment, I

16   don't think that's in the record.

17       I think this is -- we deal with cases like this.  And

18   that's why Pretrial Services recommended conditions, and that's

19   why Judge Cousins ordered them.  It is unusual, but it is not

20   beyond the pale of cases that we have in the court.

21       And I think with the strict condition that Your Honor is

22   now contemplating, which we embrace, that we could reasonably

23   assure the safety of the community.

24       I do want to just make sure -- and it may be that I'm

25   wrong -- that the halfway house will accept people who are

1  charged with what Mr. Benjamin is charged with.

2       **THE COURT:**  That's a good question.  Ms. Friesen, do

3  you know is that a possibility?

4       **MS. FRIESEN:**  Your Honor, I'm currently -- the halfway

5  house will accept these type of defendants.  And I'm currently

6  checking on the availability at the halfway house as we speak.

7       **MR. BLANK:**  I think this is the right approach,

8  Your Honor, and I think it is the right balance.

9       **THE COURT:**  What I'm going to do is I'm going to

10  remand this back to Judge Cousins with the direction that the

11  conditions be altered such that, number one, he have no

12  personal electronic devices with internet capability.  That any

13  device would have to be through the communal device.  That he

14  be held in a halfway house and subject to the rules and

15  conditions that Pretrial Services thinks best.

16      I would think it would be a very strict, at least

17  initially, adherence and really detention at the halfway house;

18  and that the condition that he participate in mental health

19  treatment as directed remain obviously.  And I think that

20  should be a priority.

21      But he would not have access to his own electronic devices

22  with internet capability.  And would be in a halfway house.

23      This still should be -- there still should be sureties.  I

24  want this to be on a bond with sureties so Mr. Benjamin knows

25  if he violates it, he would be putting his sureties in jeopardy

1  as additional deterrence.

2      But I think the -- as much as his parents would want him

3  there and would want to have the responsibility, I just don't

4  have the confidence that they are going to be in a position to

5  safeguard public safety.  So I think the halfway house would be

6  an appropriate setting at this point.

7          **MR. BLANK:**  Thank you, Your Honor.  Unfortunately,

8  about the beginning half of your pronouncement of judgment, I

9  froze up and didn't hear it.  But I trust the minute order will

10  reflect all the conditions that Your Honor is remanding for

11  Judge Cousins.  So I don't think you will need to repeat it.

12          **THE COURT:**  It is essentially the same conditions but

13  no electronic devices -- not two but none that have internet

14  capability -- and residence in a halfway house.

15          **MR. BLANK:**  Yes, Your Honor.

16          **THE COURT:**  Okay.

17          **MR. BLANK:**  We will set the matter for next Thursday

18  which is the 22nd.  That's when Judge Cousins will be sitting

19  for magistrate duty anyway.

20          **MR. GOURISARIA:**  Your Honor, if I may?

21          **THE COURT:**  Yes.

22          **MR. GOURISARIA:**  If those are the final conditions,

23  Your Honor, I would respectfully request you give the

24  Government a weeks' time to consider an appeal.  And I can be

25  in touch with Defense Counsel about scheduling an appearance

```
 1   before Judge Cousins once I know from my end.

 2           THE COURT:  All right.  Well, nothing is going to

 3   happen in a week until you get to Judge Cousins.  I don't think

 4   I have to formally stay anything because I'm just remanding

 5   with orders.  But if you are going to take an appeal, I think

 6   you have enough on the record now to take an appeal.

 7           MR. GOURISARIA:  Thank you, Judge.

 8           THE COURT:  All right.  All right.  So that will

 9   conclude this matter today.  And I want to thank his parents

10   and the victim's parents for appearing.  And I know it takes

11   courage to do that.  And the Court appreciates your sacrifice

12   and your effort.  Thank you.

13           MR. BLANK:  Thank you very much, Your Honor.

14           MR. GOURISARIA:  Thank you, Your Honor.

15           THE COURT:  Thank you.

16           MS. FRIESEN:  Thank you, Your Honor.

17                (Proceedings adjourned at 4:08 p.m.)

18                        ---oOo---

19

20

21

22

23

24

25
```

1

2

3                    **CERTIFICATE OF REPORTER**

4          We certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:   Thursday, October 15, 2020

8

9

10

11     _____

12                    Marla F. Knox, RPR, CRR
                       U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25